■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MANUEL BETANCOURT, Appellant.—Appeal by the · defendant from a judgment of the County Court, Westchester County (Colabella, J.), rendered February 6, 1987, convicting him of murder in the second degree, criminal possession of a weapon in the third degree, and criminal possession of a weapon in the fourth degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of those branches of the defendant's omnibus motion which were to suppress his statements to law enforcement authorities, physical evidence and identification testimony.

Ordered that the judgment is affirmed.

The evidence adduced at the pretrial hearing in this case established that at about 10:45 P.M. on June 9, 1986, Police Officer Richard Cercena responded in his marked radio car to 34 Wall Avenue in Valhalla, the residence of Patricia Turscan and the codefendant Andras Turcsan. Upon arriving, the officer observed Mrs. Turcsan with "multiple stab wounds all over her body" and covered with blood, lying in the front hallway. Officer Cercena's visual inspection of the premises revealed the presence of copious amounts of blood leading from one of the upstairs bedrooms down to the front door.

The officer then spoke with the codefendant Turcsan who was present in the house and who recounted that he had been eating dinner in the living room when he heard his wife's screams from the bedroom. He explained that as he headed toward the kitchen, he encountered a black man with blood on him at the foot of the steps who hit him and fled the house.

At that point, Officer Cercena received a telephone call from a sergeant at police headquarters who instructed him "to go down to the railroad station as he had just gotten a call from a fireman who reported that a man with a lot of blood on him was running down to the railroad station". The officer proceeded in his marked patrol car nine tenths of a mile to the railroad station, passing by the firehouse and observing several firemen pointing in the direction of the station, which

was 200 yards down the road from the firehouse and within sight.

As Officer Cercena pulled into the otherwise desolate station lot, he observed the defendant jump over the divider separating the railroad station from a parking lot and begin to run across the adjacent Taconic Parkway. The officer jumped out of his car and directed the defendant to stop and come toward him. The defendant complied, and as he approached to within 40 feet, Officer Cercena noticed that the defendant was covered with blood. The officer drew his gun and commanded the defendant to stop and walk over to and place his hands up against a nearby wall, which the defendant did. Officer Cercena then frisked the defendant, and observed that he had no injuries that could account for all the blood. The search of one of the defendant's shirt pockets yielded a wad of money.

At that point, two other officers arrived on the scene and assisted Officer Cercena in effecting the arrest. After handcuffing the defendant, Officer Cercena advised him of his *Miranda* rights from memory. At the hearing, Officer Cercena testified: "I said you have the right to remain silent, anything that you say can be held against you in a court of law, you have the right to an attorney. If you couldn't afford one, one will be appointed for you and that I asked him if he understood that", to which the defendant responded in the affirmative. The officer then proceeded to question the defendant, asking "how he got the blood on him". The defendant replied that "he was in a drug deal and he got into a fight with a guy * * * and that's how he got blood on him". Officer Cercena then asked where the knife was. "He said he didn't carry a knife, he carries a .380 automatic". The defendant was thereafter transported to police headquarters.

On appeal, the defendant challenges the propriety of his arrest, asserting that it was effected without probable cause, citing in particular the discrepancy between his appearance as a Hispanic and the description of the perpetrator as a black man by the codefendant Turcsan, who was jointly indicted with the defendant for having contracted with the defendant to kill his wife. The hearing court was unpersuaded by this argument, as are we.

Having visited the bloody scene of the murder and thereafter having been summoned to the railroad station upon reports that a blood-covered man was running in that direction, which were reinforced by the confirmatory actions of the firemen, Officer Cercena was clearly warranted in entertaining a reasonable suspicion of criminal activity *(see,* CPL

140.50). Moreover, the reasonable suspicion ripened into probable cause to arrest when Officer Cercena, upon arriving at the station, observed the only individual in the vicinity attempting to flee across the highway and further observed, as the individual approached him, that he was, in fact, covered with blood. The officer's observations revealed no injuries which would have accounted for the condition *(see, People v Leung,* 68 NY2d 734; *People v Amarillo,* 141 AD2d 551; *People v Chapman,* 103 AD2d 494). All of these factors, viewed in combination, were sufficient to warrant a prudent person to believe that an offense had been committed by this individual, despite the discrepancy in the racial and/or ethnic appearance of the perpetrator. As the arresting officer explained, under the circumstances, the large amount of blood was the predominant and compelling factor.

Turning now to the adequacy of the *Miranda* warnings *(see, Miranda v Arizona,* 384 US 436), we initially reject the People's strained argument that this issue is not preserved for our review. Trial counsel moved for suppression of the defendant's statements on the basis that his client was "not fully and completely advised of his *Miranda* rights" and the court granted a hearing to determine whether the statements "followe[d] the giving of proper *Miranda* warnings". At the hearing, the defense counsel raised the precise claim which is now asserted on appeal, bringing to the court's attention two cases which directly supported his claim. Certainly, this was sufficient "to fairly apprise the court and the opposing party of the nature and scope of the matter contested, and to allow the necessary evidentiary treatment and trial-level advocacy to be pursued" *(People v Jones,* 81 AD2d 22, 41-42; *see, People v Lyons,* 125 AD2d 593, 594).

On the merits, the record does not support the hearing court's conclusion that the defendant had been "fully and properly advised of, and had effectively waived, his rights". The arresting officer's failure to have advised the defendant that he was entitled to the assistance of counsel during the course of questioning by the officer, an aspect of the warnings to which he was clearly entitled, required suppression of the subsequently elicited statements *(see, People v Hutchinson,* 59 NY2d 923; *People v Bracero,* 117 AD2d 740). We observe that the People's alternative argument that the defendant's statement was made in response to a police inquiry prompted by a concern for public safety and, therefore, need not have been preceded by *Miranda* warnings *(see, e.g., New York v Quarles,* 467 US 649; *Matter of John C.,* 130 AD2d 246) was not

advanced before the hearing court and may not be raised for the first time on appeal *(see, People v Dodt,* 61 NY2d 408, 416).

We find, however, that the admission into evidence of the defendant's statements, which were inculpatory in the weakest sense as they were simply indicative of consciousness of guilt *(see, People v Moses,* 63 NY2d 299, 308; *People v Leyra,* 1 NY2d 199, 209), was harmless beyond a reasonable doubt in view of the overwhelming evidence of guilt, including the circumstances of the arrest, the forensic connection between the defendant's bloodied clothing and the victim's blood and the testimony of Jerry Cox, a longtime friend of the codefendant Turcsan. Mr. Cox recounted the events leading up to the murder, i.e., that on the evening of the murder, he accompanied Mr. Turcsan, who was in possession of over $3,000, to The Bronx to pick up the defendant and bring him back to Westchester, and that, pursuant to Turcsan's instructions, Cox dropped the defendant off at the Turcsan residence at a specified time. Furthermore, the statements were, in substance, repeated in the defendant's trial testimony. We are satisfied that there was no reasonable possibility that the admission of the statement affected the outcome of the trial *(see, People v Sanders,* 56 NY2d 51, 66-67; *People · v Bongarzone,* 116 AD2d 164, 172-173, *affd* 69 NY2d 892; *People v Lyons, supra,* at 595).

The defendant further asserts that his challenge to the jury panel as underrepresentative of Hispanics and, therefore, violative of his constitutional right to a jury drawn from a fair cross section of the community, was improperly denied. Assuming, arguendo, that the defendant satisfied the first two requirements necessary to establish a prima facie violation of the fair cross section requirement, i.e., that Hispanics constitute a "distinctive" group in the community and that their representation on venires is not fair and reasonable in relation to their numbers in the Westchester community *(see, Duren v Missouri,* 439 US 357, 364; *People v Guzman,* 60 NY2d 403, *cert denied* 466 US 951), the defendant nevertheless failed to demonstrate that the underrepresentation was attributable to systematic exclusion, that is, that the underrepresentation was inherent in the particular jury selection process utilized *(People v Guzman, supra,* at 410). Specifically, the defendant did not establish that the court's random solicitation of those named on the voter registration and New York State Department of Motor Vehicles lists and State income tax rolls *"caused* the particular exclusion of Hispanics" *(People v Guzman, supra,* at 411). Nor is there any merit to the defen-

dant's claim that, cognizant of the fact that Hispanics are underrepresented on jury pools, the Commissioner of Jurors was bound to undertake a recruitment operation or to pursue procedures specifically designed to insure that the representation of Hispanics was increased *(see, People v Chestnut,* 26 NY2d 481, 490).

We have examined the defendant's remaining contentions and find them to be without merit. Mollen, P. J., Thompson, Rubin and Spatt, JJ., concur.